This was an action to foreclose a first mortgage upon premises of the named defendant located in the town of Norwich. The premises, which formerly housed a retail furniture store, consisted of an old brick building, ranging from one to three stories in height, in downtown Norwich. The defendant Ketover had signed the mortgage note. On April 22, 1977, the plaintiff obtained a judgment of strict foreclosure with law days of June 7, 1977, and succeeding days. The debt was $70,842.72 plus costs and attorneys' fees. None of the defendants redeemed. Upon motion by the plaintiff pursuant to § 49-14 of the General Statutes the court, on June 15, 1977, appointed three appraisers to appraise the property within ten days after the time limited for redemption had expired. On June 17, 1977, the appraisers filed with the clerk of the court a written report of their appraisal, which consisted of a majority report giving a valuation of $54,000 and a minority report with a valuation of $70,000. Each of the two reports was subscribed and sworn to by the appraisers at Norwich on June 17, 1977, before James J. Murphy, Jr., a commissioner of the Superior *Page 149 
Court, and each bears a proper notation to that effect. No other oath was administered to the appraisers.
The three appraisers appointed by the court were Silverstein, Riess and Schnipp. Silverstein was alerted to his appointment by Attorney Murphy at a casual meeting on June 15, 1977, and received written confirmation on June 17. On the morning of June 17, Silverstein called Schnipp and set up an appointment for all three appraisers at 10 a.m. at Schnipp's office. Before he left for the appointment, he received a call from Riess to the effect that there would be no meeting at 10 a.m., that Riess and Schnipp had arrived at a valuation of $54,000, that Murphy was preparing the papers, and that he, Silverstein, could stop at Murphy's office to sign. Silverstein advised Riess that his valuation was $70,000 and that he could not go along with $54,000. Silverstein had submitted a detailed appraisal report on April 5, 1977, in connection with the judgment of foreclosure. He had not looked at the property since then and he had had no meaningful discussions with Riess or Schnipp. He relied on his appraisal of April 5.
Riess received notice of his appointment on June 16, 1977. He took a quick look inside the building and had some discussion with Schnipp, who thought $53,000 was fair. Riess had appraised the premises on March 15, 1977, for Murphy, for $55,000. Allowing for some vandalism and depreciation since then, Riess and Schnipp compromised on a value of $54,000. Schnipp had not previously appraised the premises. In response to a telephone call from Murphy on June 15, he replied that there was not enough time for a formal written report. Murphy told him just to look at the building, to come up with a value and to let him know. He examined the premises *Page 150 
on June 16 and worked on his figures that night. He discussed his figures with Riess but not with Silverstein.
Although the plaintiff has not yet made application for a deficiency judgment, it is a fair assumption that it will do so, and thus the defendant Ketover has filed his objection. The defendant does not allege the consideration of improper elements or the use of improper methods in determining value. He claims instead that as a matter of law the appraisal was not the joint act of all three appraisers, and that no oath of office was administered to them.
The history of § 49-14 indicates that it was adopted for the protection of mortgagors. Prior to 1833 the foreclosure of a mortgage operated as a bar to any subsequent action on the note. Chapter 18 of Public Acts 1833 removed the bar and ever since then the right of a mortgagee to a deficiency judgment after strict foreclosure has always been coupled with some provision for fixing the actual value of the property as of the date of the foreclosure, and for making that valuation a conclusive basis for determining the existence and amount of any claimed deficiency. Staples v. Hendrick,89 Conn. 100.
That only two of the appraisers concurred in the written report is not contrary to the statute. Dunn
v. Flynn, 107 Conn. 272, 275. A mistake by one of the appraisers is insufficient to invalidate the appraisal. Equitable Life Assurance Society v.Slade, 122 Conn. 451, 458. But the appraisal must be the joint act of all three, "bringing to bear ... the individual knowledge and the individual judgment of each, affording the opportunity for the correction of an individual member's error by action of the others." Ibid. The statute contemplates, at *Page 151 
least where only two concur, that the appraisers "all consider together the appraisal to be made."Dunn v. Flynn, supra, 275. Here there was little if any joint action by the three appraisers. There was no discussion concerning the elements of value or the methods involved. There was no opportunity to consider the individual knowledge and judgment of each. The informal meeting which might have provided that opportunity was apparently canceled.
Section 49-14 provides that the appraisers "shall, under oath ... appraise the mortgaged property." This requirement is met if some proper officer administers to them an oath pursuant to § 1-25 of the General Statutes. A slight deviation in the form of the oath does not render the appraisal fatally defective. Perry v. DeRosa, 4 Conn. Sup. 427, 428. The appraisers act in a quasi-judicial capacity; their authority is imposed for public purposes of a judicial nature. Dunn v. Flynn, supra, 274. They are therefore public officers in pursuit of a public purpose.Congress Bank Trust Co. v. Brockett,111 Conn. 490, 492. While the exact form of the oath is not legislated, the requirement that they be administered an oath of office is the essence of this legislation. It serves to impose upon them the solemn obligation of their office and is, therefore, mandatory. See Daly v. Fisk, 104 Conn. 579, 583.
In the present case there clearly was no oath administered to the appraisers prior to their embarking upon their duties. They did, however, swear to the truth of the matters contained in the written report. There is no requirement that their report be sworn to. See Practice Book (Bound Ed.), Forms, p. 449. Such "swearing," therefore, was presumably in response to the requirement of an oath in § 49-14, but it does not meet the test of substantial compliance. At best, it is merely an affidavit that the facts set forth are true, not the conclusions. *Page 152 
 Section